774 N.W.2d 733 (2009)
278 Neb. 945
STATE of Nebraska, appellee,
v.
Jordan M. GOODWIN, appellant.
No. S-08-1159.
Supreme Court of Nebraska.
November 20, 2009.
*737 Thomas C. Riley, Douglas County Public Defender, for appellant.
Jon Bruning, Attorney General, and Erin E. Tangeman for appellee.
HEAVICAN, C.J., and WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
After giving a statement to police in which he admitted firing shots which killed a 6-year-old girl, Jordan M. Goodwin was charged in the district court for Douglas County with first degree murder and use of a firearm in the commission of a felony. Goodwin was 14 years 3 months of age at the time of the shooting. The district court denied Goodwin's motion to transfer his case to juvenile court and Goodwin's motion to suppress a statement he gave to police. Goodwin was tried before a jury. His defense was that he fired the fatal shots, but that he did so without the intent to kill and was therefore guilty only of manslaughter. After the jury received a step instruction which permitted it to find Goodwin guilty of first degree murder, guilty of second degree murder, guilty of manslaughter, or not guilty, the jury returned a verdict of guilty of second degree murder. The jury also found Goodwin guilty of the related weapons charge. The court entered judgment on the convictions and sentenced Goodwin to 50 to 50 years' imprisonment on the second degree murder conviction and to a consecutive term of 10 to 10 years' imprisonment on the weapons charge, with credit given for time served. This is Goodwin's direct appeal.

I. BACKGROUND
The fatal shooting occurred in the late afternoon of October 5, 2007, outside an Omaha residence. The exact circumstances of the shooting were disputed at trial. Generally, however, the record shows that on the day of the shooting, Goodwin, who had previously run away from an enhanced treatment group home where he had been placed following a juvenile court delinquency adjudication, was living in a rented duplex with two adults to whom he was not related. All three sold drugs out of the residence.
Earlier in the afternoon of the shooting, Goodwin was involved in an argument with Maya Mack in the presence of several other persons who were gathered in a garage near Mack's home. At one point *738 during the argument. Goodwin pointed a handgun in Mack's direction. Mack told him not to point the gun at her unless he planned to use it, and a witness to the argument told Mack not to worry because the gun was not loaded. Mack then threw a container of spray paint at Goodwin. After Mack left the gathering, Goodwin told another person who was present that he needed ammunition for the handgun.
Later that afternoon, Mack was driven by her stepsister, Alexis Holford, to a home located in Mack's neighborhood for the purpose of buying marijuana. Mack's friend Brianna Russ and 6-year-old Alazia Alford were also passengers in the vehicle driven by Holford. As Holford's vehicle arrived, a vehicle driven by Michael Coleman, in which Goodwin and another person were passengers, pulled out of a parking space behind the house and parked nearby. Holford parked in the vacated parking space, and Mack and Russ exited the vehicle and began walking toward the rear entrance of the house. As she walked, Mack shouted something to Goodwin and Coleman, who were still in their vehicle. Moments later, Mack and Russ heard gunfire, and Mack turned to see Goodwin standing outside the vehicle and shooting at them. Both women were struck by gunshots, Russ in the left leg and Mack in the left arm. Neither was seriously injured. Holford, who was still seated in the vehicle, also observed Goodwin shooting. Immediately after the shots were fired, Coleman and Goodwin left the scene in the vehicle driven by Coleman.
At least two of the shots fired by Goodwin entered the rear window of the vehicle which Mack and Russ had exited, striking and killing Alford. The record generally reflects that Goodwin did not know that Alford was in the vehicle at the time of the shooting. Before giving her own statement to police, Russ called Goodwin and informed him that he had "killed the little girl." He responded that he had not intended to do so.
Additional background information will be included in our discussion of each of Goodwin's assignments of error.

II. ANALYSIS

1. MOTION TO TRANSFER TO JUVENILE COURT

(a) ADDITIONAL BACKGROUND
Shortly after charges were filed, Goodwin filed a motion requesting the district court to waive jurisdiction and transfer the case to the separate juvenile court. The district court conducted an evidentiary hearing on the motion. The evidence presented at that hearing reflects that Goodwin was born on June 23, 1993. In June 2004, he was charged in juvenile court with third degree arson, a misdemeanor, and placed on juvenile diversion. In 2006, after he was charged in juvenile court with disorderly conduct, Goodwin was referred for a comprehensive child and adolescent assessment, which was conducted in October 2006 by Visinet, Inc. The evaluators noted that Goodwin had an extensive history of behavior problems in school and at home, where he lived with his grandmother. He admitted use of alcohol on an episodic basis and daily use of marijuana. The evaluators recommended therapeutic foster care placement, a regular substance abuse education course, and placement in an alternative school program due to his "history of aggressive and noncompliant behavior at school."
Goodwin was reevaluated by Visinet in March 2007 after being charged with use of a weapon to commit a felony and discharge of a firearm at an occupied building. At that time, Goodwin was being held at the Douglas County Youth Center. Evaluators recommended that Goodwin *739 participate "in an enhanced treatment group home program that will address his behavioral concerns while providing him with increased structure and ongoing supervision." The Office of Juvenile Services (OJS) took custody of Goodwin and placed him in a group home, where he received individual and group therapy, saw a psychologist, and received chemical dependency counseling. On two occasions, Goodwin did not return to the group home after receiving weekend passes, requiring issuance of capias warrants to secure his return.
On approximately September 5, 2007, Goodwin again ran away from the group home. After this, a group home therapist noted that Goodwin's whereabouts were unknown and that he "will need a locked facility until he is ready to positively function in the community once again. He will also need to be checked for chemical abuse."
On September 18, 2007, Goodwin was apprehended on a shoplifting charge and placed in a juvenile youth center in Council Bluffs, Iowa, pending transport back to Nebraska. During transport on September 21, Goodwin told the transportation officer that he needed to use the restroom; when he was allowed to do so, he escaped. Goodwin's OJS caseworker reestablished contact with him after his arrest following the shooting, and she saw him monthly at the Douglas County Youth Center, where he was held. She testified that Goodwin was "[u]nfriendly" and "very rude and disrespectful" during these visits and that he blamed her for the fatal shooting.
Grady Porter, the chief deputy probation officer in Douglas County, testified that when a juvenile is adjudicated in a delinquency case, he or she can be placed on probation, placed with the Department of Health and Human Services, placed with OJS, or committed to a secure juvenile correctional facility. Porter testified that commitment to a secure facility is for an indefinite period and that the longest stay in such a facility that he was aware of was approximately 18 months. Porter was unaware of any facility that would accept a juvenile adjudicated of first or second degree murder.
In its written order denying Goodwin's motion to transfer, the district court found, after examining all the relevant factors, that Goodwin's contacts with the juvenile system had not resulted in his rehabilitation and that the best interests of the public required keeping him in custody beyond the period of his minority.

(b) ASSIGNMENT OF ERROR AND STANDARD OF REVIEW
Goodwin contends that the district court erred in denying his motion to transfer his case to the separate juvenile court. A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion.[1]

(c) DISPOSITION
The district court and the separate juvenile court have concurrent jurisdiction over felony prosecutions of a juvenile, defined as a person who is under the age of 18 at the time of the alleged criminal act.[2] When a felony charge against a juvenile is filed in district court, the juvenile may file a motion requesting that court to waive its jurisdiction to the juvenile court for further proceedings under *740 the Nebraska Juvenile Code.[3] The district court "shall" transfer the case unless a sound basis exists for retaining jurisdiction.[4] The burden of proving a sound basis for retention lies with the State.[5]
At the time the district court considered Goodwin's motion, it was statutorily required to consider the following factors:
(1) The type of treatment such juvenile would most likely be amenable to; (2) whether there is evidence that the alleged offense included violence or was committed in an aggressive and premeditated manner; (3) the motivation for the commission of the offense; (4) the age of the juvenile and the ages and circumstances of any others involved in the offense; (5) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court, and, if so, whether such offenses were crimes against the person or relating to property, and other previous history of antisocial behavior, if any, including any patterns of physical violence; (6) the sophistication and maturity of the juvenile as determined by consideration of his or her home, school activities, emotional attitude and desire to be treated as an adult, pattern of living, and whether he or she has had previous contact with law enforcement agencies and courts and the nature thereof; (7) whether there are facilities particularly available to the juvenile court for treatment and rehabilitation of the juvenile; (8) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (9) whether the victim agrees to participate in mediation; (10) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; and (11) such other matters as the county attorney deems relevant to his or her decision.[6]
In order to retain the proceedings, the court does not need to resolve every factor against the juvenile; moreover, there are no weighted factors and no prescribed method by which more or less weight is assigned to each specific factor.[7] It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile.[8]
In this case, the district court issued a 12-page order explaining its consideration and weighing of various factors set forth in § 43-276. The court noted that Goodwin had been in the juvenile court system for several years and that treatment efforts had been unsuccessful. It found that there was some evidence the shooting was premeditated and that the evidence showed that Goodwin intended to shoot at Mack. Although the court considered the fact that Goodwin was only 14 years old at the time of the offense, it also found that he had "significant contacts" with the juvenile court and that his educational history was "replete with violent *741 incidents." It expressly found that "[efforts at treatment have been ignored."
The district court also found that Goodwin had "demonstrated that he desires to live on his own and on his own terms." The court found that based on Goodwin's unsuccessful rehabilitation and supervision within the juvenile system, it did not appear that he could be rehabilitated prior to reaching the age of 19, when juvenile court jurisdiction would end. Based on its consideration of all the § 43-276 factors, the district court refused to transfer the proceeding to juvenile court.
In this appeal, Goodwin does not argue that any of the district court's findings were factually incorrect. Instead, he challenges the weighing process employed by the court in reaching its conclusion. He argues that the evidence before the court suggested manslaughter, not murder, and that the State failed to present evidence that Goodwin was not amenable to further treatment which could be provided through the juvenile court. Goodwin contends the district court should have afforded greater weight to the facts that he has lacked parental guidance and support throughout his life and that he has significant mental health and substance abuse issues. Goodwin argues that the only factor weighing against transfer to juvenile court was the violent nature of the charged offense.
We do not consider lightly Goodwin's youth and his disadvantaged upbringing. But neither can we ignore the violent nature of the crime, Goodwin's previous history of violent and aggressive behavior, and his failure to respond positively to corrective treatment offered through the juvenile justice system prior to the shooting. When a court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to the juvenile court.[9] Because there is ample evidence to support each of the findings which led the district court to deny Goodwin's motion to transfer, we cannot and do not conclude that it abused its discretion.

2. STATEMENT TO POLICE

(a) ADDITIONAL BACKGROUND
At approximately 8 p.m. on the day of the shooting Goodwin, accompanied by his grandmother, arrived at the Omaha central police station and asked to speak to an officer. Det. Christopher Perna had received information about the homicide and was aware that witnesses had identified Goodwin as the shooter. Perna and Det. Doug Herout took Goodwin and his grandmother to an interview room. The room was approximately 8 by 12 feet in size with one door and no windows. A sign outside the room stated that the room was subject to audio and video recording.
Goodwin and his grandmother were left alone it the room for approximately 6 minutes. The detectives then entered and began speaking with Goodwin and his grandmother. The interview was videotaped. Goodwin's grandmother told the detectives that she was his legal guardian. Prior to interviewing Goodwin, Perna used an Omaha Police Department form to advise Goodwin of his Miranda rights. The detectives directed the questions from the rights advisory form to Goodwin, and he answered. When the officers informed Goodwin that he had the right to an attorney, his grandmother identified Goodwin's attorney by name and stated that she would need to call the attorney, but neither *742 she nor Goodwin requested that the attorney be present. No other mention of an attorney was made, and both Goodwin and his grandmother stated they were willing to talk to the officers.
Goodwin originally told the officers that he generally stayed to himself and had no friends. Perna told him to either "be straight" with them or say he could not answer a question. Perna stated that he knew a lot of the answers to his questions already, so he would know when Goodwin was being honest. Goodwin then said that he had been at a shopping mall that day, alone, buying shoes and shirts. He said that after leaving the mall, he visited a girl whom he refused to identify. The officers asked why Goodwin thought he was there for questioning. He replied that his grandmother had told him he was accused of murder and that he was "surprised." The officers told him that his name had come up in the investigation and that someone had identified him as the shooter. They said there was a "good chance" there was no intent to kill the child, that the shooter was just intending to send a message, and that the death was a "tragic accident." Goodwin almost immediately began crying and said that he just wanted to shoot in the air to scare Mack and Russ and that he did not mean to shoot at the car. At that point, his grandmother asked to stop the interview, and it was stopped.
Goodwin filed a pretrial motion to suppress the statement he gave to the police. He argued that the statement was inadmissible because it was obtained without a voluntary waiver of his right to counsel and was the product of police coercion and inducement. After conducting an evidentiary hearing, the district court denied the motion. The videotaped statement was received in evidence at trial over Goodwin's objection and published to the jury.

(b) ASSIGNMENTS OF ERROR AND STANDARD OF REVIEW
Goodwin contends that the district court erred in receiving his statement in evidence, because (1) he had not made a knowing, voluntary, and intelligent waiver of his right to counsel and his privilege against self-incrimination and (2) the statement was not voluntary, but, rather, was a product of police coercion and inducements of leniency.
In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in Miranda v. Arizona,[10] an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.[11]

(c) DISPOSITION

(i) Did Goodwin Voluntarily Waive His Miranda Rights Before Making His Statement?

In Miranda v. Arizona,[12] the Supreme Court held that authorities must employ procedural safeguards during a custodial interrogation to protect a suspect's privilege *743 against self-incrimination. Specifically, authorities must advise an individual in custody that he has the right to remain silent and the right to an attorney.[13] In its order overruling Goodwin's motion to suppress, the district court noted the State's argument that Goodwin was not in custody at the time of the interview, but it did not address this issue, because it found that Goodwin had waived his Miranda rights. On appeal, the State does not argue that Goodwin was not in police custody at the time of his statement. Accordingly, we assume he was in custody and focus our review on the waiver issue.
Miranda rights can be waived if the suspect does so knowingly and voluntarily.[14] A valid Miranda waiver must be voluntary in the sense that it was the product of a free and deliberate choice and made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.[15] In determining whether a waiver is knowingly and voluntarily made, a court applies a totality of the circumstances test.[16] Factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct.[17]
Based upon principles articulated by the U.S. Supreme Court in In re Gault,[18] Goodwin argues that the district court did not adequately consider the significance of his youth in determining that he voluntarily waived his rights prior to his inculpatory statement to police. In In re Gault, the Court held that constitutional procedural safeguards, including the privilege against self-incrimination and the right to counsel, are applicable in juvenile delinquency proceedings which may result in commitment to an institution in which the juvenile's freedom is curtailed. The Court noted that "admissions and confessions of juveniles require special caution,"[19] and further stated:
If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.[20]
Goodwin argues that because of his youth, police should have conducted further inquiries beyond the familiar Miranda warnings to ensure that Goodwin fully understood the potential consequences of waiving his rights and making a statement to police about his involvement in the shooting. Goodwin urged the trial court and now this court to adopt the following position taken by the American Bar Association:
"Youth should not be permitted to waive the right to counsel without consultation with a lawyer, and only after a full inquiry by a court into the youth's comprehension of that right and his or her capacity to make the choice intelligently and understandingly. Any waiver of *744 counsel must be in writing and made of record."[21]
This court has utilized the "totality of the circumstances test" to determine whether there has been a voluntary and effective waiver of Miranda rights by adults[22] and juveniles[23] alike. We have employed the same test in the different but related context of determining whether a juvenile has knowingly and intelligently waived the right to counsel in juvenile proceedings.[24] In another related context, we have noted that while the minority of an accused is a factor to consider in determining the voluntariness of a confession, it is not determinative.[25] Because the age, education, and intelligence of an accused are included within the totality of circumstances which a court must assess in determining whether there has been a knowing and voluntary waiver of Miranda rights prior to a custodial interrogation, a court necessarily exercises "special caution" with respect to juveniles.[26] Accordingly, we decline to modify the totality of the circumstances test for determining the voluntariness of Miranda waivers by minors.
The district court's findings of historical fact are not clearly erroneous; they are fully supported by the record. Goodwin came to the police station with his grandmother, who was also his legal guardian, after she learned that he had been implicated in the shooting and advised him to cooperate with the investigation. After obtaining preliminary information from Goodwin, Perna explained that because there were accusations directed at Goodwin and they were in a police facility, he needed to advise Goodwin of his rights before asking further questions. Perna asked Goodwin if he understood what Miranda rights were, and Goodwin acknowledged that he did. Before questioning, Goodwin further acknowledged his understanding that Perna was a police officer, that Goodwin had a right to remain silent and not answer questions, that anything Goodwin said could be used against him in court, that Goodwin had a right to consult with a lawyer and have a lawyer present during questioning, and that if Goodwin could not afford a lawyer, one would be appointed for him. After receiving these advisements and indicating that he understood them, Goodwin agreed to speak to police. There is nothing in the record to indicate that Goodwin was impaired by drugs or alcohol at the time of the questioning. As noted above, Goodwin's prior contacts with law enforcement authorities are well-documented, although the record does not reflect whether he was ever previously advised of his Miranda rights or subjected to custodial interrogation.
In order to require cessation of custodial interrogation, the subject's invocation of the right to counsel must be unambiguous and unequivocal.[27] Statements such as "[m]aybe I should talk to a lawyer"[28] or "`I probably should have an *745 attorney'"[29] do not meet this standard. Goodwin made no statement invoking his right to counsel. We conclude that his grandmother's comment regarding Goodwin's attorney did not constitute an unambiguous and unequivocal invocation of Goodwin's right to counsel on his behalf. Based upon our independent review of the totality of the circumstances, we likewise conclude that Goodwin knowingly and voluntarily waived his Miranda rights before talking to police about the shooting.

(ii) Was Goodwin's Statement to Police Voluntary?
The Due Process Clause of U.S. Const. amend. XIV and the due process clause of Neb. Const. art. I, § 3, preclude admissibility of an involuntary confession.[30] The prosecution has the burden to prove by a preponderance of the evidence that incriminating statements by the accused were voluntarily given and not the product of coercion.[31] In making this determination, a totality of the circumstances test is applied, and factors to consider include the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his or her will to be easily overborne.[32] An additional factor to consider is whether the suspect is a minor, but this factor is not determinative.[33] Coercive police activity is a necessary predicate to a finding that a confession is not voluntary.[34]
The pertinent historical facts are essentially undisputed. Goodwin came to the police station with his grandmother, who was seated next to him throughout the police questioning. Perna told Goodwin that his name had come up during the investigation and that he needed to "be straight" in answering questions about his activities that day. Several minutes later, after Goodwin had denied any involvement, Perna told him that a witness had identified him as the shooter. Perna said he thought there was a "good chance" that the shooter did not know there was a child in the car and that he did not intend to kill her. Both officers characterized the event as a "tragic accident," and Herout stated, "No one means to kill an innocent kid." At that point, Goodwin stated that he did not intend to shoot the girl in the car and stated that it was an accident. His grandmother then terminated the interview, which had lasted approximately 25 to 30 minutes. Prior to that time, Goodwin had not requested that the interview be stopped or indicated that he did not understand what was taking place.
Goodwin argues that the officers' comments about the lack of intent to kill and their characterization of the shooting as a tragic accident were "`minimizing' tactics" which amounted to an implicit promise that punishment would be less severe if Goodwin admitted his involvement.[35] In rejecting this argument, the district court noted that the officers' "reference to the crime being an `accident' was unaccompanied *746 by any other express threats or promises and was made in the context of a continued effort by the officers to urge [Goodwin] to tell the truth."
The confession of an accused may be involuntary and inadmissible if obtained in exchange for a promise of leniency.[36] For example, in State v. Smith,[37] we held that a police officer's statement that he would attempt to have the case transferred to juvenile court if the 15-year-old defendant cooperated with police was an inducement which rendered the subsequent confession involuntary. No such promise of leniency was expressly made in this case. But we have recognized that under certain circumstances, a promised benefit might be inferred from an officer's statement to an accused, if such an inference is reasonable.[38] In any circumstance, "the benefit offered to a defendant must be definite and must overbear his or her free will in order to render the statement involuntary."[39] Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or promise, does not make a subsequent confession involuntary.[40]
Based upon our independent review, we conclude that no implied promise of leniency can reasonably be inferred from the questioning techniques utilized by the detectives. There was no suggestion of any definite benefit which Goodwin could expect to receive in exchange for his statement. The references to lack of intent and a "tragic accident" were made in the context of the detectives' efforts to persuade Goodwin to truthfully explain his involvement in the shooting. Although the record suggests that the detectives may have been downplaying the circumstances as a technique to get Goodwin to tell the truth, this fact alone does not amount to an implied promise of leniency or persuade us that Goodwin's will was overborne.[41]
Based upon our independent review of the historical facts as determined by the district court, and which we find to be supported by the record, we conclude that Goodwin's statement to police was voluntary and admissible at trial.

3. STEP INSTRUCTIONS

(a) ADDITIONAL BACKGROUND
In the formal jury instructions, the jury was told that count I of the information charged Goodwin with first degree murder. The jury was informed that under this count, it could find Goodwin (1) guilty of first degree murder, (2) guilty of second degree murder, (3) guilty of manslaughter, or (4) not guilty. One jury instruction set out the material elements the State needed to prove beyond a reasonable doubt in order to convict Goodwin of first degree murder, e.g., an intentional killing done purposely with deliberate and premeditated malice. It then stated:
If you find from the evidence beyond a reasonable doubt that each of the foregoing material elements ... is true, it is your duty to find [Goodwin] guilty of the crime of murder in the first degree done purposely and with deliberate and premeditated malice, and you shall so indicate by your verdict.

*747 If, on the other hand, you find that the State has failed to prove beyond a reasonable doubt any one or more of the material elements ... it is your duty to find [Goodwin] not guilty of the crime of murder in the first degree. You shall then proceed to consider the lesser-included offense of murder in the second degree ....
The instruction then set forth the material elements of second degree murder, e.g., an intentional killing without premeditation. It then stated:
The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing material elements for conviction of the crime of murder in the second degree.
If you find from the evidence beyond a reasonable doubt that each of the foregoing material elements ... is true, it is your duty to find [Goodwin] guilty of the crime of murder in the second degree done intentionally but without premeditation, and you shall so indicate by your verdict.
If, on the other hand, you find that the State has failed to prove any one or more of the material elements ... it is your duty to find [Goodwin] not guilty of the crime of murder in the second degree. You shall then proceed to consider the lesser-included offense of manslaughter....
The jury instruction then set forth the material elements for manslaughter, e.g., an unintentional killing while in the commission of an unlawful act. Goodwin objected to the giving of this step instruction on the ground that it violated his right to due process, but he did not request an alternative instruction. The jury was also instructed on the doctrine of transferred intent as follows: "When one attempts to kill a certain person but by mistake or inadvertence kills a different person, the crime, if any so committed, is the same as though the person originally intended to be killed had been killed."
During its deliberations, the jury sent a written question to the trial judge, asking: "Do we have to agree or disagree una[n]imously on the presence of or lack of intent before moving on to the lesser count?" After consultation with counsel, and with their concurrence, the judge submitted a supplemental jury instruction in response to the question, stating: "The instructions that you have embody all of the law to be applied in this case."

(b) ASSIGNMENT OF ERROR AND STANDARD OF REVIEW
Goodwin contends that the district court erred in giving the "acquittal first" step instruction to the jury, because it deprived him of his due process right to have the jury consider his defense to the charges. The determination of whether the procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.[42] On questions of law, a reviewing court has an obligation to reach its own conclusions independent of those reached by the lower courts.[43]

(c) RESOLUTION
We have long held that step instructions which require consideration of the most serious crime charged before consideration of lesser-included offenses are not erroneous.[44] We have noted that such *748 instructions provide "`for a more logical and orderly process for the guidance of the jury in its deliberations.'"[45] Goodwin contends that this practical justification must yield to the principle that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment ... or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, ... the Constitution guarantees criminal defendants `a meaningful opportunity to present a complete defense.'"[46] Goodwin contends that the step instruction deprived him of the right to present the defense that he fired the shots without an intent to kill and was therefore guilty only of manslaughter, because it required the jury to acquit him of first and second degree murder before considering the offense of manslaughter. He argues that just as an evidence rule requiring exclusion of certain evidence may violate a defendant's constitutional right to a complete defense,[47] the "acquittal first" step instruction given in this case violated his due process right to present his defense that he acted without intent to kill.
In State v. Jones,[48] we held that an "acquittal first" step instruction similar to that given in this case did not prevent the jury from considering the defendant's contention that he was guilty only of manslaughter. We reasoned that although the jury's final verdict must be unanimous, the instruction did not require the jury, in its preliminary deliberation and discussion, to unanimously decide that the defendant was not guilty of a greater offense before considering a lesser-included offense. In the years since Jones, courts in other states have approved or disapproved the giving of "acquittal first" step instructions based upon various statutory and policy considerations,[49] but we have been directed to no case holding such instructions to be unconstitutional. The Arizona Supreme Court has directed trial courts to abandon the "acquittal first" instruction approved in State v. Wussler,[50] which we cited with approval in Jones, in favor of an instruction which permits a jury to render a verdict on a lesser-included offense if, after full and careful consideration of the evidence, it is unable to reach agreement with respect to the greater charged offense.[51] But the court characterized this change as "procedural in nature" and stated that "we remain persuaded that the acquittal-first requirement does not violate the United States or Arizona Constitutions."[52] Other courts have also held that "acquittal first" step instructions are not constitutionally deficient.[53]
*749 We reach the same conclusion. The step instruction did not prevent the jury from considering the critical issue of whether Goodwin had formed an intent to kill when he fired the fatal shots. Unlike the circumstances presented in Holmes v. South Carolina,[54] Goodwin was not precluded from offering evidence to support his theory of defense. Nor was his lawyer restricted in any way from arguing that Goodwin did not intend to kill anyone and was therefore guilty of the lesser offense of manslaughter. In the end, the jury had to decide whether Goodwin acted with the requisite intent, and it was free to consider all evidence bearing on that issue in its deliberations with respect to first and second degree murder. The step instruction did not violate Goodwin's constitutional right to present a complete defense.
For completeness, we note Goodwin's argument that the step instruction given in this case was based upon NJI Crim. 14.06, and that NJI2d Crim. 3.1, the current pattern instruction for lesser-included offenses, does not utilize the language requiring the jury to find a defendant not guilty of a greater offense before considering a lesser offense. NJI2d Crim. 3.1 includes a listing of the offenses which the jury is to consider and the elements of each offense. It then instructs the jury:
You must separately consider in the following order the crimes of (here insert crimes charged beginning with the greatest and listing included crimes in sequence). For the (here insert greatest crime) you must decide whether the state proved each element beyond a reasonable doubt. If the state did so prove each element, then you must find the defendant guilty of (here insert greatest crime) and [stop]. If you find that the state did not so prove, then you must proceed to consider the next crime in the list, the (here insert first lesser included). You must proceed in this fashion to consider each of the crimes in sequence until you find the defendant guilty of one of the crimes or find (him, her) not guilty of all of them.[55]
Neither party requested that this instruction be given in this case. Although we find no constitutional infirmity or other error in the step instruction that was given, we conclude that NJI2d Crim. 3.1 provides a clearer and more concise explanation of the process by which the jury is to consider lesser-included offenses, and we encourage the trial courts to utilize the current pattern instruction in circumstances where a step instruction on lesser-included homicide offenses is warranted.[56]

III. CONCLUSION
For the reasons discussed, we conclude that Goodwin's assignments of error are without merit, and we affirm the judgment of the district court.
AFFIRMED.
NOTES
[1] State v. Jones, 274 Neb. 271, 739 N.W.2d 193 (2007); State v. Reynolds, 247 Neb. 608, 529 N.W.2d 64 (1995).
[2] Neb.Rev.Stat. §§ 43-245(4) and 43-247 (Cum.Supp.2006).
[3] Neb.Rev.Stat. §§ 43-261 (Reissue 2004) and 29-1816 (Reissue 1995); State v. Phinney, 235 Neb. 486, 455 N.W.2d 795 (1990).
[4] §§ 43-261 and 29-1816. See, also, State v. Doyle, 237 Neb. 60, 464 N.W.2d 779 (1991).
[5] State v. Doyle, supra note 4.
[6] Neb.Rev.Stat. § 43-276 (Reissue 2004).
[7] State v. Jones, supra note 1.
[8] Id.
[9] State v. Reynolds, supra note 1.
[10] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[11] State v. Hilding, 278 Neb. 115, 769 N.W.2d 326 (2009); State v. Rogers, 277 Neb. 37, 760 N.W.2d 35 (2009).
[12] Miranda v. Arizona, supra note 10.
[13] Id.; In re Interest of C.H., 277 Neb. 565, 763 N.W.2d 708 (2009).
[14] State v. Walker, 272 Neb. 725, 724 N.W.2d 552 (2006).
[15] Id., citing Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).
[16] See State v. Walker, supra note 14.
[17] Id.
[18] In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
[19] Id., 387 U.S. at 45, 87 S.Ct. 1428.
[20] Id., 387 U.S. at 55, 87 S.Ct. 1428.
[21] Brief for appellant at 27-28.
[22] See, e.g., State v. Walker, supra note 14.
[23] State v. McDonald, 195 Neb. 625, 240 N.W.2d 8 (1976).
[24] In re Interest of Dalton S., 273 Neb. 504, 730 N.W.2d 816 (2007).
[25] State v. Garner, 260 Neb. 41, 614 N.W.2d 319 (2000).
[26] See In re Gault, supra note 18.
[27] Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); State v. Hilding, supra note 11.
[28] Davis v. United States, supra note 27, 512 U.S. at 455, 114 S.Ct. 2350.
[29] State v. Hilding, supra note 11, 278 Neb. at 117, 769 N.W.2d at 330.
[30] In re Interest of Tyler F., 276 Neb. 527, 755 N.W.2d 360 (2008); State v. Garner, supra note 25.
[31] See id.
[32] State v. Ray, 266 Neb. 659, 668 N.W.2d 52 (2003).
[33] See id. See, also, State v. Garner, supra note 25; State v. Chojolan, 253 Neb. 591, 571 N.W.2d 621 (1997).
[34] State v. Ray, supra note 32; State v. Garner, supra note 25.
[35] Brief for appellant at 33.
[36] State v. Garner, supra note 25.
[37] State v. Smith, 203 Neb. 64, 277 N.W.2d 441 (1979).
[38] State v. Garner, supra note 25.
[39] Id. at 50, 614 N.W.2d at 327. See, also, State v. Ray, supra note 32; State v. Walker, 242 Neb. 99, 493 N.W.2d 329 (1992).
[40] State v. Garner, supra note 25.
[41] See id.
[42] State v. Parker, 276 Neb. 661, 757 N.W.2d 7 (2008).
[43] State v. Arterburn, 276 Neb. 47, 751 N.W.2d 157 (2008).
[44] See, e.g., State v. Robinson, 272 Neb. 582, 724 N.W.2d 35 (2006); State v. Benzel, 269 Neb. 1, 689 N.W.2d 852 (2004); State v. Mowell, 267 Neb. 83, 672 N.W.2d 389 (2003); State v. Buckman, 259 Neb. 924, 613 N.W.2d 463 (2000); State v. Jones, 245 Neb. 821, 515 N.W.2d 654 (1994), over-ruled on other grounds, State v. Burlison, 255 Neb. 190, 583 N.W.2d 31 (1998).
[45] State v. Jones, supra note 44, 245 Neb. at 828, 515 N.W.2d at 658, quoting State v. Wussler, 139 Ariz. 428, 679 P.2d 74 (1984).
[46] Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), quoting California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).
[47] Holmes v. South Carolina, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).
[48] State v. Jones, supra note 44.
[49] See, e.g., Green v. State, 119 Nev. 542, 80 P.3d 93 (2003); State v. Mays, 158 N.C.App. 563, 582 S.E.2d 360 (2003); People v. Helliger, 96 N.Y.2d 462, 754 N.E.2d 756, 729 N.Y.S.2d 654 (2001).
[50] State v. Wussler, supra note 45.
[51] State v. LeBlanc, 186 Ariz. 437, 924 P.2d 441 (1996).
[52] Id. at 439-40, 924 P.2d at 443-44.
[53] See Catches v. United States, 582 F.2d 453 (8th Cir.1978). See, also, United States v. Moccia, 681 F.2d 61 (1st Cir. 1982); People v. Zwiers, 191 Cal.App.3d 1498, 237 Cal.Rptr. 123 (1987).
[54] Holmes v. South Carolina, supra note 47.
[55] NJI2d Crim. 3.1B.
[56] See State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006).