IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. WELLS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

TYON WELLS, APPELLANT.

Filed September 25, 2018.    No. A-18-527.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Kevin A. Ryan, of Ryan Law Offices, for appellant.

Douglas J. Peterson, Attorney General, Erin E. Tangeman, Derek T. Bral, Senior Certified Law Student, and, on brief, Sarah E. Marfisi, for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

INTRODUCTION

Tyon Wells was 14 years old when he was charged in the Douglas County District Court with second degree murder, second degree assault, and two counts of use of a deadly weapon to commit a felony. He filed a motion to transfer the case to juvenile court, which was denied. Wells appeals, assigning error to the denial of the motion to transfer. We affirm.

BACKGROUND

On March 9, 2018, the State filed an information charging Wells with second degree murder, in violation of Neb. Rev. Stat. § 28-304 (Reissue 2016), a Class IB felony; second degree assault, in violation of Neb. Rev. Stat. § 28-309 (Reissue 2016), a Class IIA felony; and two counts

- 1 -

of use of a deadly weapon (firearm) to commit a felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 2016), each a Class IC felony. The information indicated that the event which gave rise to the charges occurred "[o]n or about" February 25, 2018. In February 2018, Wells was 14 years 2 months old. He was born in December 2003.

Wells filed a motion to transfer the matter to juvenile court under Neb. Rev. Stat. § 29-1816 (Supp. 2017). Specifically, Wells asked the district court to waive jurisdiction of the matter to the separate juvenile court for further proceedings.

A juvenile transfer hearing was subsequently held by the district court. During this hearing, the State called a detective of the Omaha Police Department to testify. In addition, the State offered into evidence numerous police reports regarding the incident which gave rise to Wells' current charges; police reports regarding a previous incident which involved Wells; and a photograph of Wells holding a handgun.

The evidence offered by the State revealed that during the late afternoon on February 25, 2018, the Omaha Police Department received notification that three gunshots had been fired in the area of 25th and Crown Point Avenue. Shortly after police received this notification, 911 emergency dispatch service operators received a telephone call from the victim of a shooting. The victim reported that he had been shot near 25th and Crown Point Avenue, but that he was currently located in the parking lot of a nearby high school. Officers were dispatched to the high school where they located three individuals near a vehicle. Seventeen-year-old Devon D. was the driver of the vehicle and the person who had telephoned 911. He was suffering from a gunshot wound to the arm. Sixteen-year-old Landon H. was a backseat passenger of the vehicle. He was not injured. Seventeen-year-old Zachary P. was the front seat passenger of the vehicle. He was suffering from a gunshot wound to his back. Both Devon and Zachary were transported to the hospital. Devon was treated and subsequently released. Zachary was ultimately pronounced dead after arriving at the hospital. A bullet had entered the left side of his back, just below his shoulder blade. It then traveled from left to right and from back to front, striking multiple major organs.

Police interviewed Devon and Landon about the circumstances surrounding the shooting. Devon reported that he had driven Zachary and Landon to meet an individual so that Zachary could sell this individual some marijuana. When Devon, Landon, and Zachary arrived at the previously agreed upon location where they were to meet the buyer, Devon observed two male individuals approach his vehicle. One of the individuals was Caucasian and one of them was African American. Both individuals appeared to Devon to be "high school age." Devon later positively identified the Caucasian individual as 15-year-old Jesse V., who attended the same high school as Zachary.

Devon described how Jesse opened the rear driver's side door of Devon's vehicle and got inside. The African American individual, whom Devon did not know, stood outside of the vehicle, near the open rear driver's side door. Jesse and Zachary began to discuss the sale of the marijuana. Jesse asked to see the marijuana, but Zachary wanted to see Jesse's money first. Finally, Zachary told Jesse that he would just sell him the marijuana at school the next day. Jesse then started to get out of the vehicle. As Jesse was getting out, the African American male pulled out a gun, pointed it at Devon, Landon, and Zachary, and instructed them to give him the marijuana. Zachary told

Devon to start driving and he complied. As the vehicle started to move, three gunshots were fired into the vehicle, one shot struck Devon and one shot struck Zachary.

When questioned by police, Landon gave an account that was "almost identical" to Devon's statement. In addition, Landon also positively identified Jesse as being the Caucasian individual who got into Devon's vehicle to buy marijuana.

Police later arrested and questioned Jesse. Jesse told officers that he attended high school with Zachary and considered Zachary to be a friend. In addition, Jesse indicated that he had bought marijuana from Zachary on numerous occasions. Two days before the shooting, on Friday, February 23, 2018, Jesse had tried to purchase half an ounce of marijuana from Zachary. Zachary indicated that he did not have what Jesse wanted; however, he could get Jesse something during the weekend. Zachary then sent Jesse a text message on February 25 indicating that he now had marijuana to sell to Jesse. The two set up a time to meet that afternoon. Information recovered from Zachary's cellular telephone confirmed Jesse's description of their conversations in the days leading up to the shooting.

Jesse informed police that "he was short on money" to buy the marijuana. As a result, he contacted a friend, Wells, and asked if Wells wanted to go in together to purchase the marijuana. Wells agreed. Jesse indicated that he and Wells intended to purchase half an ounce of marijuana from Zachary.

After Jesse observed Devon's vehicle pull over near 25th and Crown Point Avenue, Jesse and Wells began walking toward the vehicle. Jesse told police that he knew that Wells frequently carried a gun with him. Jesse thought that, oftentimes, Wells was carrying the guns for his fellow gang members. Jesse told police that he did not have any specific knowledge about whether Wells was carrying a gun as they approached Devon's vehicle.

Jesse believed that Zachary was nervous about selling him marijuana in Wells' presence because Zachary was not familiar with Wells. Jesse indicated that ultimately he and Zachary agreed to conduct the drug transaction at school the next day. Jesse said that he began to get out of the car, and noticed that Wells had pulled out a handgun from his pocket. Jesse believed that Wells was pointing the gun at Zachary. Jesse said that he immediately put his hands in the air and asked Wells, "What are you doing?" He also told Wells to "Put that away." Immediately after Jesse said this, Wells started firing into the vehicle. Jesse and Wells then ran away from the scene. While they were running, Jesse asked Wells "[W]hy are you shooting at people over a baggy of weed?" Jesse indicated that Wells responded, "because they weren't going to give it up."

The next morning, after Jesse learned that someone had died the day before in a shooting at 25th and Crown Point Avenue, he had contact with Wells. During this contact, Wells and Wells' sisters told Jesse not to be a "snitch." They also instructed Jesse to remove the SIM card from his cellular telephone and not to talk to the police. They then coached Jesse on how to get rid of other, incriminating evidence. Jesse admitted that he did remove the SIM card from his phone and then dropped it somewhere in the yard of Wells' residence.

Police later arrested Wells. During their investigation, police learned that Wells is a member of the Flatland Bloods gang. In addition, police recovered a photograph that had been posted on Wells' "Facebook page." That photograph depicts Wells taking a picture of himself while he holds what appears to be a firearm in his right hand.

At the transfer hearing, the State also offered evidence of a previous incident involving Wells where the police were contacted. In March 2017, when Wells was 13 years old and in the seventh grade, he was cited for disorderly conduct due to an incident involving the school bus he was riding. The school bus had been ordered to pull off of the road due to inclement weather. Wells apparently contacted his mother to come and pick him up. Wells' mother arrived at the school bus' location a short time later. However, the bus driver would not permit Wells to get off of the bus pursuant to the instructions of the bus' dispatch service. Wells became very upset. He began yelling obscenities at the bus driver, used gang references to intimidate the driver, and banged and kicked the bus door until it opened. Wells also attempted to reach over the driver in an attempt to push buttons and start the bus. The bus driver indicated that she had to physically remove Wells' hands from the dashboard and the steering wheel. The driver also indicated that she felt very threatened by Wells' actions and was concerned about the safety of the other students on the bus.

As a result of the incident on the school bus, Wells completed a diversion program through the juvenile court. He was also expelled from school.

After the State rested, Wells offered the testimony of three witnesses: Colleen A. Conoley, a licensed psychologist who conducted a neuropsychological evaluation of Wells; Thomas Incontro, an attorney who is frequently appointed as a guardian ad litem for juveniles involved with juvenile court; and Tonya Wells, Wells' mother.

Conoley testified that she is a neuropsychologist who specializes in children and adolescents. In order to complete her psychological evaluation of Wells, she met with him on four separate occasions while he was confined at the Douglas County Youth Center. She also reviewed some collateral information, including police reports regarding Wells' current charges and his school records. Conoley also obtained information from Wells' mother, Tonya.

Conoley learned that prior to his arrest, Wells lived primarily with Tonya, with the exception of a 1-year period when he was approximately 6 years old. During that 1-year period, Wells lived with his grandmother while Tonya was in jail. Wells has three sisters.

Tonya reported that Wells received good grades in school until he reached the sixth grade, when his grades began to decline. In contrast to Tonya's report about Wells' academic abilities, testing of Wells revealed that he has a much lower than average IQ. Conoley testified that Wells' ability to answer questions was much lower than expected for an average 14-year-old. In addition, Conoley indicated that Wells has a "diminished capacity for judgment." He is focused only on immediate gratification.

Wells has a history of behavioral problems at school, which are indicative of a lack of respect for authority figures. Conoley detailed these problems in her report. In addition, she noted that her own testing revealed that Wells scored high on a scale measuring violent and aggressive tendencies and psychopathic features.

Wells' behavioral problems at school began when Wells was in the third grade. At that time, Wells was suspended from school for 2 days after he refused to follow the instructions of a staff member and, instead, decided to leave the school grounds. Wells had to be chased and escorted back to the school by a security guard. While he was being escorted back to school, Wells screamed obscenities and threatened the security guard with violence.

In the fourth grade, Wells admitted to receiving marijuana from a fellow student and then giving that marijuana to another student. On other occasions during his fourth grade year, Wells screamed and punched a wall; engaged in a mutual fight with another student; and physically assaulted a student by forcefully punching him in the head, chest, and stomach. In the fifth grade, Wells was punished for pulling the fire alarm and slapping another student who was "on his nerves."

At the beginning of his sixth grade year, Wells was punished at school numerous times for refusing to obey authority figures and being disrespectful. During the second half of the year, after Wells had turned 12 years old, he was punished for fighting on one occasion. On another occasion, Wells became upset with his basketball coach during a basketball game. Wells tried to hit the coach. It took at least three other individuals to restrain Wells. On a third occasion, Wells was punished after becoming extremely angry in the cafeteria. He flipped over a 250-pound serving cart again and again, moving it toward cafeteria staff.

In seventh grade, Wells was punished on at least 26 different occasions for being disrespectful to school staff or being disruptive in class. In addition to these instances, Wells was also punished for admitting to smoking marijuana before coming to school; recklessly running through the hallway and colliding with another student which led to the other student being transported to the hospital by ambulance; and wearing gang apparel. In March of his seventh grade year, Wells was expelled from school after the bus incident detailed above. Approximately 1 month later, Wells was expelled from his new school for fighting and rough housing with another student.

In eighth grade, prior to Wells' arrest on the current charges, he was punished on at least 10 different occasions for being disrespectful to school staff or being disruptive in class. He was also punished for stealing from another student.

Wells admitted to Conoley that beginning at age 12, he began smoking marijuana multiple times per week. Also at the age of 12, Wells was initiated into the Flatland Bloods gang. Wells indicated that his initiation involved "a circle beating." When Wells was 13 years old, he was diagnosed as having a sexually transmitted disease.

Conoley believed that Wells' defiant behaviors escalated when he was approximately 12 years old. She opined that this escalation in behavior was directly associated with Wells' frequent marijuana use, which also began when he was 12 years old. Conoley stated that Wells' frequent marijuana use resulted in his "poor ability to regulate anger." Specifically, Conoley explained how Wells' marijuana use affected his behavior:

> [T]he problem isn't during the toxicity or the high period, the two hours that the substances in effect in his body. The problem is what I would refer to as the marijuana hangover that can last up to two weeks in adolescence. And so what happens from a neurocognitive prospective [sic] is that we have our own system in our brain with special receptors that receive molecules very similar to the chemicals in marijuana, and we call those Cannabinoids.
>
> So we may [sic] our own Cannabinoids. And what this system does is it has a very high concentration of receptors within the hippocampus. And that allows the system in the

brain to really deal with stress and deal with anger and tension, and it also helps someone pay attention, take in more sensory experiences and build memories.

And so when he isn't high, the problem is that the THC, what's [sic] it's done to those receptor sites is because it is taken in at a four times more readily rate, it downgrades the receptor sites, so he can't access his own Cannabinoid system, and so he's less capable of dealing with frustration, stress, those types of things. And some marijuana, it comes across as paranoia. For him, it looks like it came across as a poor ability to regulate anger.

Conoley also opined that many of Wells' behavioral problems were not "early onset," but instead were "largely adolescent-confined." Additionally, Conoley associated Wells' negative behaviors, including the behavior associated with the current charges, with peer pressure. Conoley believed that Wells thought he would gain approval from his peers for the shooting. She believed that this type of adolescent thinking made Wells more likely to engage in risky behavior.

Ultimately, Conoley recommended that Wells' criminal case be transferred to the juvenile court. Conoley based her recommendation on the nature of Wells' behavioral problems; his ability to recognize those problems; and his amenability to treatment. Conoley specifically opined that Wells was amenable to change. In fact, she reported that Wells' responsibility and motivation to change tested at high levels. She indicated that during her time with Wells, he started to appreciate that smoking marijuana was bad for him. In addition, he began to recognize that he has an anger problem that he needs to address.

Conoley testified that in the juvenile court system, Wells could receive rehabilitation and treatment that is focused on teenagers. In addition, he could receive medication to assist in his recovery process. In contrast, Conoley testified that the services available to Wells if the case were to proceed in district court are "severely limited." Conoley identified three potential secured residential treatment facilities for juveniles dispersed across the country which would be able to meet Wells' needs. While she was unable to provide specifics about the level of security present at each of these facilities or about the expected length of Wells' treatment, she did affirmatively testify that, based upon her experience, at least two of the recommended facilities would accept Wells into the program and would treat his behavioral problems. Conoley noted that Wells' family, especially his mother, was very supportive of him participating in programs through the juvenile court. Conoley believed this support would assist Wells in the treatment process.

During the State's cross-examination of Conoley, Conoley admitted that she has worked on eight or nine similar cases where a transfer of criminal charges from district court to juvenile court was being considered. She conceded that she had always recommended transfer to the juvenile court and had never recommended that a case should remain in district court. Conoley also indicated during her cross-examination that Wells' brain would not be fully mature until he reached his mid to late twenties. Conoley acknowledged that the juvenile court would lose jurisdiction over Wells when he turned 19 years old.

Wells also called Incontro to testify at the transfer hearing. Incontro testified that he frequently serves as a guardian ad litem who acts in the best interests of the juveniles who are within the jurisdiction of the juvenile court. He indicated that if Wells' case was transferred to the juvenile court, that court would lose jurisdiction over Wells when he turned 19 years old. Incontro

opined, however, that because Wells was only 14 years old, that the juvenile court would have jurisdiction over him for a relatively "long time in the juvenile world." Incontro also testified that while the juvenile court had jurisdiction over Wells, it could offer him such programs as mental health treatment, including necessary medications; drug treatment; and family therapy. Incontro was able to identify at least three facilities that he believed would be able to provide Wells with the treatment that he requires.

Finally, Wells called Tonya to testify on his behalf. Tonya first described Wells as a small child. She said that he was loving, caring, and very energetic. He also loved playing sports and received good grades in school. Tonya indicated that when Wells began to get in trouble at school, she would talk to him about making better choices and she would punish him by grounding him or taking away his cellular telephone. Tonya believed that Wells was typically apologetic for his inappropriate behavior.

Tonya testified that after the bus incident during Wells' seventh grade year, he was placed in a diversion program through the juvenile court. As a part of that program, Wells attended anger management classes and individual counseling. Because he successfully completed the diversion program, no criminal charges were filed against him. Tonya believes that if Wells' current case is transferred to the juvenile court, he will comply with any program offered to him. She also indicated that she would do "everything and beyond" to support him with his juvenile court services.

During her testimony, Tonya admitted that she did not have any prior knowledge about Wells' gang involvement or the extent of his marijuana use.

After the hearing, the district court entered an order denying Wells' motion to transfer the case to juvenile court. In reaching its decision, the court found that multiple factors weighed in favor of the district court retaining jurisdiction over Wells. These factors included that the charges against Wells involve "the most serious acts of violence;" that Wells instructed Jesse to destroy evidence and not talk to police; that Wells is clearly a threat to public safety; that Wells has ready access to firearms; that Wells regularly uses marijuana; and that Wells admits that he is a member of a local street gang. In addition, the court noted in its order that the juvenile diversion program Wells was required to complete when he was 13 years old does not appear to have had any effect on his "episodes of angry and defiant behavior."

The district court also found, "One of the few factors that weigh in favor of transfer to Juvenile Court is [Wells'] age." Because the juvenile court would not lose jurisdiction over Wells until he reached 19 years of age, services could be provided to him for approximately 4½ years. However, the court also considered Conoley's testimony that Wells' brain will not be fully mature by the time he reaches 19 years of age. The court found that "[t]his coupled with [Wells'] extreme impulsivity and access to firearms weighs against transfer." The court indicated its belief that Wells' need for treatment and rehabilitation will extend "far beyond the period of time [the] juvenile court would have jurisdiction."

Finally, the court considered that, despite Wells' history of "threatening and assaultive behaviors," he has never before been formally charged or referred to the juvenile court for intervention. He did complete a diversion program, but no formal charges were ever filed against him in that incident.

Ultimately, the court reasoned, "Using the balancing test by which public protection and societal security are weighed against the practical and non-problematic rehabilitation of [Wells], the Court finds that [the] Motion to Transfer to the Juvenile Court is overruled and that this Court shall maintain jurisdiction over this case."

Wells appeals from the district court's order.

## ASSIGNMENT OF ERROR

On appeal, Wells contends that the district court abused its discretion in denying his motion to transfer his case to juvenile court.

## STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Bluett*, 295 Neb. 369, 889 N.W.2d 83 (2016). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## ANALYSIS

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations contained in the information filed against Wells put him within this category of juvenile offenders. Wells was 14 years 2 months old at the time of the offenses, and as noted by his counsel at oral argument, he would not have been subject to district court jurisdiction had the offenses occurred approximately 2 months earlier. Second degree murder is a Class IB felony. See § 28-304. Second degree assault is a Class IIA felony. See § 28-309. Use of a deadly weapon to commit a felony is a Class IC felony. See § 28-1205(1)(c).

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to § 29-1816(3).

In the instant case, when Wells moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in Neb. Rev. Stat. § 43-276(1) (Reissue 2016):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may

require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in mediation; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

In this case, the district court found almost all of the factors set forth in § 43-276(1) favored retaining the case. Such factors include the serious nature of the charges Wells is currently facing; his lengthy history of violent behavior, particularly in the school setting; his access to firearms; his involvement in a local street gang; and his extensive use of marijuana. Based upon our review of the record, we cannot say that the district court abused its discretion in its consideration of these factors.

The evidence presented at the termination hearing revealed that Wells shot two unarmed teenagers over a small amount of marijuana. One of Wells' victims died as a result of his wounds. According to interviews with the surviving victims and with Jesse, who was with Wells at the drug deal, the shooting was relatively unprovoked. Essentially, Wells did not want to wait until the next day to buy the marijuana. Additionally, contrary to Conoley's testimony at the hearing, there did not appear to be any peer pressure placed on Wells to engage in the shooting. In fact, Jesse told police that when Wells pulled out the gun, Jesse told him to stop and not to shoot. Jesse could not understand why Wells shot Zachary and Devon. Zachary was Jesse's friend.

After the shooting, Wells attempted to hide his involvement by telling Jesse not to "snitch" on him and by instructing Jesse to destroy any relevant evidence.

The evidence also revealed that Wells has a history of threatening and assaultive behaviors, which date back to his third grade year. He has repeatedly threatened and assaulted teachers, staff, and other students. He has demonstrated an extreme disrespect for authority. It does not appear that any intervention taken by the school system has affected or altered Wells' violent tendencies.

In fact, when Wells was expelled from school after the bus incident in seventh grade, he was expelled from his alternative school only 1 month later. And, while there has been minimal attempts to intervene with Wells' behavioral problems outside of school, the record indicates that Wells' recent participation in a juvenile diversion program did not alter his behavioral problems at all. Conoley's testing of Wells revealed that he scored high on scales measuring aggressiveness, violence, and psychopathic features. Conoley reported that Wells does not consider the feelings of others.

Evidence presented by the State indicated that Wells has access to firearms and is known to carry a handgun on his person. Jesse reported to police that Wells often carries handguns for other, older members of his gang. Wells admitted to smoking marijuana on a regular basis since he turned 12 years old. The motivation for Wells' current offense appears to have been obtaining marijuana in order to support his ongoing drug habit.

The district court did find that a few of the factors set forth in § 43-276(1) favored transferring the case. Such factors include Wells' young age and his lack of any formal criminal history. However, the district court found that despite the fact that Wells is only 14 years old, the juvenile court would not have sufficient time to provide him with treatment before that court lost jurisdiction when Wells turned 19 years old. The district court indicated that Wells posed a serious risk to the safety of the public and that his "extreme impulsivity and access to firearms" is very concerning.

We cannot say that the district court's findings about Wells' long-term treatment needs are an abuse of discretion. Moreover, we note that Wells presented rather limited evidence about appropriate juvenile treatment centers which would be willing to accept him given the serious nature of his crimes and given his involvement in a street gang. Conoley testified that she thought there were three facilities that would be willing to house Wells. However, she was unable to provide much information regarding the possible length of his care at those centers or about the security of those centers.

Additionally, as recently noted by the Nebraska Supreme Court, "the possibility of disposition under the juvenile code remains available to juveniles even if their case is transferred from juvenile to criminal court." *In re Interest of Tyrone K.*, 295 Neb. 193, 211, 887 N.W.2d 489, 501 (2016). Specifically, Neb. Rev. Stat. § 29-2204(5) (Reissue 2016) provides:

> Except when the defendant is found guilty of a Class IA felony, whenever the defendant was under eighteen years of age at the time he or she committed the crime for which he or she was convicted, the court may, in its discretion, instead of imposing the penalty provided for the crime, make such disposition of the defendant as the court deems proper under the Nebraska Juvenile Code.

In his brief on appeal, Wells asserts that the district court erred in failing to transfer his case because he presented expert testimony in favor of the transfer. Wells contends that the State failed to provide any expert to contradict his expert's opinion. Wells' assertion lacks merit. There is no statutory requirement that the State must have an expert testify at transfer hearings. Further, although Conoley's testimony may have been relevant and helpful to the district court's decisionmaking, the court was not bound by her ultimate opinion that Wells could be successfully

rehabilitated in a secure juvenile detention center. See *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018) (triers of fact are not required to take opinions of experts as binding upon them, and determining weight to be given expert testimony is uniquely province of fact finder). The district court was free to reach its own conclusion based upon the totality of the evidence before it.

Upon our review of the record, we cannot say that the district court abused its discretion in denying Wells' motion to transfer to juvenile court and in finding a sound basis to retain jurisdiction in district court. While there were factors that weighed in favor of transferring the matter to juvenile court, like Wells' age, there were other factors that weighed in favor of retaining jurisdiction in the district court. The district court balanced the factors it deemed most significant, and there was appropriate evidence to support its decision. When a court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to the juvenile court. See *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009).

## CONCLUSION

For the reasons stated in this opinion, we conclude that the district court did not abuse its discretion in denying Wells' motion to transfer his case to juvenile court.

AFFIRMED.