IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. SMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
PHILIP F. SMITH, APPELLANT.

Filed February 18, 2014.    No. A-13-583.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Brenda J. Leuck for appellant.

Jon Bruning, Attorney General, and Carrie A. Thober for appellee.

IRWIN, MOORE, and BISHOP, Judges.

BISHOP, Judge.

Philip F. Smith was charged with and convicted of first degree sexual assault on a child, second offense, a Class IB felony. Smith was 33 years of age at the time of the offense; the child, E.H., was 12. The district court for Douglas County sentenced Smith to a term of 35 to 45 years' incarceration. We affirm Smith's conviction and sentence.

I. FACTUAL BACKGROUND

1. THE CHILD'S TESTIMONY

E.H. testified that she knew Smith and that Smith and her mother were in a relationship until a couple years prior to trial.

E.H. testified that when she was 9 years of age and in third grade, Smith would enter her room when she was sleeping and put his hands on her "butt and [her] vagina." His finger would "rub the inside" of her vagina, but not in her "vagina hole." He would put his fingers "between the folds," on the inside of the folds and "[r]ub them up and down." E.H. shared a room with her younger sisters; she recalled them being ages 6 and 2 at that time. This happened more than one

- 1 -

time when her sisters were not in the room and when her mother was at work. E.H. did not tell her mother because she was scared and "didn't think she was going to believe me," because "it seemed crazy."

In February or March 2012, E.H.'s mother was gone, and E.H. and her sisters were in their mother's room watching a movie. The babysitter was asleep. Smith showed up at the house, and when E.H. came out of the bathroom, he asked her to "suck his thing," which she said she understood to mean his penis. When she told him no and he asked why, she told him "that's nasty." He then offered her $20, she said no, again, and he left her alone.

In April 2012, when E.H. was 12 years of age and Smith was no longer living at E.H.'s residence, E.H. testified that Smith asked to come into E.H.'s house after her mother left to go out with a friend. He had been there earlier while E.H.'s mother was there, but he left when her mother left. E.H. remained at home and was in charge of caring for her younger sisters, now ages 9 and 4. The younger sisters shared a room across the hall from E.H.'s room. All the children were in their bedrooms when E.H. heard knocking at the door. When she answered the door, Smith told E.H. that "it was cold and his ride was coming," so she let him in the house. He was downstairs on the telephone when she returned to her room. The door to E.H.'s room was left open, and she was asleep for 10 or 15 minutes when Smith entered her room upstairs. E.H. was in her pajamas and lying on her stomach when Smith walked in and starting touching her buttocks with his hand and then turned her over onto her back. He pulled her pajama pants and underwear down toward her ankles and then pulled his own jeans down. E.H. recalled that Smith had on dark blue boxers and that he "pull[ed] his penis out of the hole in the boxers." Smith pushed E.H.'s legs up by her head and "start[ed] pushing up against me" with "[h]is penis." E.H. confirmed that Smith was touching her "bare vagina with his bare penis" and that his penis felt "hard." Smith did not fully put his penis inside E.H.'s vagina, but placed his penis "[o]n the vagina hole." E.H. confirmed her understanding of the "lips of the vagina" being different "than the actual hole to the vagina," and she said that Smith placed his penis past the lips of her vagina and that it was touching the hole of her vagina more than one time. E.H. said Smith was unable to put his penis inside her "vagina hole" because she kept moving. E.H. described Smith's body movement as "[g]oing back and forth," and E.H. told him that "he need[ed] to stop and that he need[ed] to leave" seven times. E.H. said this went on for 10 minutes. Smith said nothing to her and would not stop until E.H.'s youngest sister came into the room. Smith then put on his pants and left E.H.'s room. When E.H.'s mother returned home, E.H. heard her yelling at Smith and making him leave the house. E.H. did not report the incident to her mother at that time because she "was scared" and "didn't think she was going to believe me," because "I never told her anything before."

When asked why she finally told her mother and the police about what was going on, E.H. said it was "[b]ecause [Smith] had really tried to put his penis inside of me." E.H. acknowledged that Smith had never hit her, physically disciplined her, or threatened her in any way.

## 2. THE MOTHER'S TESTIMONY

E.H.'s mother, R.H., age 28 at trial, testified that she initially became involved with Smith when she was 19. They lived together in Omaha for about 6 months at one location in

2009 when E.H. would have been 9 years of age, and then they lived together from 2009 until 2010 at another place in Omaha. In 2011 and 2012, Smith would stay over at the place R.H. was residing at the time of trial, but he never lived there. Months before the incident in April 2012, R.H. had broken up with Smith, but he was "popping up a lot," and although R.H. was "really not wanting to deal with him, . . . he kept coming around." Smith was not the biological father of any of R.H.'s children.

R.H. testified that on the night of the April 2012 incident, Smith and R.H. had some cocktails at R.H.'s house prior to R.H.'s leaving to go out with a friend. When R.H. was leaving, she told Smith he had to leave, and he told her he was waiting for a ride. She left him on her front steps with the door locked and told him, "Don't try to get back in my house." R.H. testified that when she came home, Smith was asleep in her bed and she told him "to get the hell out of my bed," and that he didn't say anything, but just "basically ran out the door."

At some point after returning home, it is unclear whether it was before or after Smith left the residence, R.H. saw E.H. in the kitchen, and she "[l]ooked like she was scared of something and nervous . . . [j]ust by the way she was talking and looking." E.H. made no disclosures to her mother about what happened at that time.

R.H. testified that behavioral changes in E.H. started when "she was about ten." She stated that "[h]er attitude changed dramatically," she was "[v]ery temperamental," her "level of respect for authority was changing," and "she was doing a lot of things that she wouldn't normally do." However, E.H. was a good student and was on honor roll.

On May 14, 2012, E.H. talked to R.H. about Smith, and R.H. took E.H. to the police station to make a formal report. Following that, they went to Project Harmony, a child advocacy center, where they were separated and E.H. was formally interviewed without her mother present. Within the next 2 weeks, they returned to Project Harmony for E.H. to have a medical examination.

### 3. THE DETECTIVE'S TESTIMONY

Chad Kavars, a child victim/sexual assault detective employed by the Omaha Police Department (OPD), testified that he had worked with Project Harmony as a child sexual assault detective for 5 years. He had been employed by OPD for 9 years, initially working as a street officer, and then as a detective for property crimes.

In his work with Project Harmony, Kavars investigates allegations of sexual and physical child abuse, as well as allegations of adult abuse and sexual assault. Kavars received special training on speaking with children, and he testified that when interviewing a child,

> it's important that you, as best you can, assess whether or not they're capable of doing an interview with you, whether -- whether or not they know the difference between truth and a lie, and whether they know their body parts and things of that nature. It's important to learn a line of questioning that would not lead a child to answer certain ways.

Kavars met alone with E.H. at Project Harmony within a couple hours after the initial report was made by R.H. and E.H. at the police station on May 14, 2012. They met for just under an hour. He informed E.H. that he was a police officer and that the interview was being recorded. He explained that this helps the child understand the importance of why they are there and that it also allows him to go back and review the video so he can watch their demeanor, "things I

wouldn't normally be able to watch specifically when I'm asking questions." Kavars determined that E.H. was age appropriate and that she seemed to understand the nature of the questions being asked. From his perspective, she gave reasonable and appropriate responses, and "like most kids," she was calm but nervous, "which is pretty typical." Kavars confirmed when speaking with E.H. that she was 12 years of age at that time.

Kavars met with Smith on May 15, 2012, in an interrogation room at OPD headquarters. Smith appeared voluntarily. Kavars read Smith his *Miranda* rights, and Smith agreed to speak with Kavars without an attorney present. The meeting lasted 1 hour 10 minutes and was video recorded. Kavars testified that the camera was turned off when Smith indicated he wanted to write E.H. a letter of apology, something Kavars had suggested during the initial interview. A second recording was made showing Smith writing a letter of apology to E.H., which Kavars testified took place within a minute of the initial interview ending. The video of Kavars' interview with Smith was played at trial, and Kavars confirmed that he had reviewed it and that it fairly and accurately reflected all questions asked by Kavars and all answers given by Smith. Details of the interview will be discussed later when we address Smith's assigned error challenging the voluntariness of the statements.

## II. PROCEDURAL BACKGROUND

Smith was charged with count I, sexual assault on a child in the first degree (occurring between February 19, 2009, and February 19, 2012), a Class IB felony, and count II, sexual assault on a child in the first degree (occurring between February 20 and April 30, 2012), a Class IB felony.

Smith filed a motion to suppress the statements he made to law enforcement, alleging that (1) they were not freely, voluntarily, or intelligently given; (2) they were given without him being informed of his *Miranda* rights; (3) they were the fruits of a custodial interrogation; and (4) they were given without Smith being advised of his rights against self-incrimination or his right to counsel. A hearing on the motion to suppress was held on December 27, 2012.

At that hearing, Kavars testified about his involvement with the case and his interview with Smith on May 15, 2012. He contacted Smith by telephone on May 14 and told Smith that he was a potential suspect in a sexual assault case and that Kavars wanted "to hear [Smith's] side of the story." Smith voluntarily went to police headquarters on May 15. The DVD's of the interview between Kavars and Smith, along with the apology letter written by Smith to E.H. (exhibits 1 through 3) were received without objection for the limited purpose of the motion to suppress hearing. Kavars testified that exhibit 4 was an OPD advisory form that he went through with Smith, that Smith understood the questions being discussed, and that Smith answered affirmatively to all questions on the rights advisement form. Exhibit 4 was received without objection for the limited purpose of the motion to suppress hearing.

The trial court denied the motion to suppress, holding that Smith "was properly advised of his *Miranda* Rights and that his decision to go forward and speak with the investigator was made freely, knowingly, intelligently and voluntarily," and that the investigator "took no actions which were inappropriate." Smith waived his right to a jury trial; the matter was tried before the district court judge on April 8, 2013, and a judgment hearing was held the next day.

The trial court found Smith not guilty on count I and guilty on count II. At sentencing, the State offered a prior conviction for enhancement, which the trial court accepted and enhanced Smith's conviction to a second offense. Sexual assault on a child in the first degree, second offense, is a Class IB felony, punishable by incarceration with a mandatory minimum of 25 years' imprisonment to a maximum of life imprisonment with time served. The trial court sentenced Smith to serve a term of 35 to 45 years' incarceration with credit given for 407 days served. Smith has timely appealed his conviction and sentence to this court.

## III. ASSIGNMENTS OF ERROR

Smith assigns that the trial court erred by (1) denying his motion to suppress statements made to law enforcement, (2) reaching a verdict on insufficient evidence, and (3) imposing an excessive sentence.

## IV. STANDARD OF REVIEW

In a bench trial of a criminal case, the trial court's findings have the effect of a verdict and will not be set aside unless clearly erroneous. *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005).

In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009).

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013).

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

## V. ANALYSIS

### 1. Motion to Suppress

Smith filed a motion to suppress the statements he made to law enforcement on the basis that (1) they were not freely, voluntarily, or intelligently given; (2) they were given without him being informed of his *Miranda* rights; (3) they were the fruits of a custodial interrogation; and (4) they were given without Smith being advised of his rights against self-incrimination or his

right to counsel. The trial court denied the motion, holding that Smith "was properly advised of his *Miranda* Rights and that his decision to go forward and speak with the investigator was made freely, knowingly, intelligently and voluntarily," and that the investigator "took no actions which were inappropriate."

Smith argues on appeal that any statements he made at the OPD headquarters should have been suppressed because they were made while he was in custody and were "involuntary and therefore inadmissible because the interrogation conducted by detective Kavars amounted to a coerced confession." Brief for appellant at 11. Smith acknowledges that he went to police headquarters voluntarily and that Kavars read him his *Miranda* rights, but that this "does not overcome the coercive tactics used by the police during the interrogation." *Id*. Smith asserts that he repeatedly denied the accusations until the detective "told him the police had his DNA evidence on [E.H.'s] clothes," and this made "Smith believe that the police had scientific proof that he [was] guilty of the charges." Smith claims that the detective's tactics were employed to elicit an incriminating statement and that "[a]lthough providing false information to a suspect has been deemed normal police protocol, taken in the totality of the circumstances it was a direct violation of . . . Smith's constitutional rights." Brief for appellant at 12.

As discussed in *State v. Burdette*, 259 Neb. 679, 698-99, 611 N.W.2d 615, 631-32 (2000):

> The U.S. Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), that in order to safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects interrogated while in police custody must be told that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.

Whether Smith was in custody or not when he made his statements was not addressed by the trial court, because it determined that Smith was "properly advised of his *Miranda* rights" and that Smith voluntarily chose to speak with Kavars. We will first evaluate whether there was a voluntary waiver of *Miranda* rights, and if so, whether Smith's statements incriminating himself were voluntarily made or improperly coerced by law enforcement.

### (a) Did Smith Voluntarily Waive
### His Miranda Rights?

In reviewing the recording of the interview between Kavars and Smith, it is clear that Smith's *Miranda* rights were read to him within a little over a minute of Kavars' entering the interrogation room and before any questioning commenced. Kavars specifically told Smith that he was under no obligation to talk with him, but that if he wanted to make a statement, Kavars had to read the advisory form so Smith would understand his rights. Smith acknowledged his understanding, and Kavars proceeded to read him his *Miranda* rights, having Smith confirm his understanding of each right before moving on to the next. Kavars informed Smith he was a police officer, and after going through the advisory of rights form, he specifically told Smith that

at any time during the interview, Smith was welcome to say that he did not want to talk any more. Kavars said he wanted to "make that clear" and had Smith acknowledge his understanding of that.

*Miranda* rights can be waived if the suspect does so knowingly and voluntarily. *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009). A valid *Miranda* waiver must be voluntary in the sense that it was the product of a free and deliberate choice and made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. *State v. Goodwin, supra*. In determining whether a waiver is knowingly and voluntarily made, a court applies a totality of the circumstances test. *Id*. Factors to be considered include the suspect's age, education, intelligence, prior contact with authorities, and conduct. *Id*.

We find no error in the trial court's determination that Smith waived his *Miranda* rights freely, knowingly, intelligently, and voluntarily. Accordingly, any statements made by Smith thereafter were admissible at trial, unless, as alleged by Smith, they were the product of police coercion.

### (b) Were Smith's Statements Product of Police Coercion?

Smith contends that even if he was provided *Miranda* rights, his statements were not admissible because they could not be viewed as voluntary due to the deceptive tactics used by Kavars in providing false information about Smith's DNA being found on E.H.'s underwear. Smith states that "[a]lthough providing false information to a suspect has been deemed normal police protocol, taken in the totality of the circumstances it was a direct violation of . . . Smith's constitutional rights." Brief for appellant at 12.

> The *Due Process Clause of U.S. Const. amend. XIV* and the *due process clause of Neb. Const. art. I, § 3*, preclude admissibility of an involuntary confession. The prosecution has the burden to prove by a preponderance of the evidence that incriminating statements by the accused were voluntarily given and not the product of coercion. In making this determination, a totality of the circumstances test is applied, and factors to consider include the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his or her will to be easily overborne. An additional factor to consider is whether the suspect is a minor, but this factor is not determinative. Coercive police activity is a necessary predicate to a finding that a confession is not voluntary.

*State v. Goodwin*, 278 Neb. at 959-60, 774 N.W.2d at 745 (emphasis supplied).

It is fundamental that a statement must be suppressed if it is obtained by offensive police practices. *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997). However, mere deception will not render a statement involuntary or unreliable; the test for determining the admissibility of a statement obtained by police deception is whether that deception produced a false or untrustworthy confession or statement. *Id*. If a benefit is offered in exchange for testimony, and the offer is definite, then a confession is involuntary and must be suppressed. *State v. Ray*, 241 Neb. 551, 489 N.W.2d 558 (1992).

Nothing in this record indicates that Smith's statements made to Kavars or the letter written to E.H. were false or untrustworthy, nor is there any evidence that Kavars made any

inappropriate offers to Smith in exchange for a statement. Kavars testified that the OPD has a protocol for conducting suspect interviews, which protocol includes providing false information to a suspect as a means of eliciting statements. Kavars explained that in this case, he had clothing that belonged to E.H. but that it did not have any DNA from Smith, contrary to what he suggested to Smith during the interview. Upon cross-examination, Kavars acknowledged that he obtained clothing from E.H. "[t]o lead the suspect to believe I had evidence I didn't have," and he agreed that the clothing was "basically used as a prop." Kavars confirmed that during his interview with Smith, he pulled those clothes out of an envelope and told Smith his DNA was on the clothing, and told him that on more than one occasion. He agreed it was a lie, but was a tactic he used. Kavars also "led [Smith] to believe that everything that happened with the victim at that residence was okay with her when she told me in the interview it wasn't."

On redirect, however, he confirmed that this was an acceptable method of interviewing and that further, he did not force Smith "in any way to admit that he had rubbed his penis on [E.H.'s] body." He further confirmed that he did not "force him in any way to admit that he had, in fact, pulled his pants down and touched the victim."

As for the apology letter written by Smith to E.H., Kavars testified that he had mentioned to Smith that he could write a letter of apology to E.H. After the initial interview was over and Kavars left the room to turn off the video camera and returned, Smith told Kavars he wanted to write E.H. an apology. Kavars testified that the second recording showing Smith writing the apology letter probably commenced "less than a minute after I left the room the first time." The DVD's received into evidence show that the initial interview ended at 9:24:00 a.m., and the video showing Smith writing the apology letter commenced at 9:25:45 a.m., so it was slightly less than 2 minutes rather than 1 minute.

The apology letter received into evidence stated: "[E.H.] I am very, very [s]orry for what i [sic] tried to do, but im [sic] glad it did not happen, i [sic] really hope that you can forgive me for that." It was signed "Philip." Kavars was asked at trial, "Detective, did you make any promises or induce the defendant in any way to either write the letter that you just read aloud or to make any of the statements that we observed during this hour-long interview?" Kavars responded, "No. When I walked back into the room to take him to - to the Douglas County Corrections, he asked me if he could write the letter." He confirmed on redirect by the State that he did not "force [Smith] in any way to write a letter of apology, apologizing to the victim for trying to have sex with her."

Upon redirect by the State, the following testimony was elicited from the detective:

State: So despite the fact that you may have used props, you were able to elicit information from [Smith]; is that fair?
Kavars: Yes.
State: Information that you - you didn't obtain by threatening him; right?
Kavars: Right.
State: You didn't obtain by coercing him in any way; right?
Kavars: Right.
State: Did you make any inducements or promises to him for leniency?
Kavars: No.

State: In fact, did you tell him that, Mr. Smith, if you tell me this information, I'll get a deal for you?

Kavars: No.

Kavars' testimony is supported by the recordings of the interview. No deals were offered by Kavars to Smith, and in fact, when Smith asked Kavars if writing a note would make a difference, Kavars told Smith that he did not know if it would help with a judge, but that Kavars was not allowed to make decisions like that. At one point, Kavars very specifically told Smith, "You don't have to write a note."

Smith relies upon *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009), in support of improper interrogation techniques warranting the suppression of a confession. However, in that case, when the defendant was interrogated by the police, she tried to assert her right to remain silent, but the police ignored her and continued to interrogate her until she confessed. *Id*. There is no evidence before us that at any time during the interview did Smith request to stop, nor did he request an attorney.

Nebraska appellate courts have upheld the voluntariness of statements obtained by deceptive police practices. See *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997) (officer falsely told defendant that police knew defendant had asked his wife to lie about when he returned home on night of murders); *State v. Walker*, 242 Neb. 99, 493 N.W.2d 329 (1992) (falsely telling defendant that sex with 15-year-old girl by mutual agreement did not constitute sexual assault did not render statement involuntary); *State v. Haywood*, 232 Neb. 97, 439 N.W.2d 511 (1989) (falsely telling defendant that his fingerprints were on bag of crack cocaine was not such offensive police practice as to have affected trustworthiness of defendant's subsequent statements); *State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986) (officer's referral to nonexistent autopsy report and befriending defendant does not render confession involuntary); *State v. Erks*, 214 Neb. 302, 333 N.W.2d 776 (1983) (officer led defendant to believe that police had statement from eyewitness to crime, which they did not have); *State v. Stevenson & Jackson*, 200 Neb. 624, 264 N.W.2d 848 (1978) (confession admissible even though both defendants were in intensive care with severe burns when statement given and officer deceptively told one defendant that his codefendant had already told police the truth).

The tactics used by the police in this case, while deceptive, cannot be characterized as such coercion that it caused Smith's "will to be easily overborne." See *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009). The entire interview lasted a little over an hour, with only Smith and Kavars in the room. Voices were never raised, and Kavars demonstrated a professional demeanor and tone throughout the interview. The deception used by Kavars about Smith's DNA being on E.H.'s underwear was barely put in play when Smith acknowledged having sexual contact with E.H., and his story changed from having only a little to drink and being "tipsy" to then suggesting maybe he was "pretty intoxicated." Smith claimed that E.H. pulled her own pants down and that he pulled his down. He claimed he was not trying to "stick it in," but just "rub it on her." If E.H. was there, Smith said he would apologize to her for "trying to have sex with her." It was at that point Kavars asked if Smith wanted to write her a note. There is nothing in this record to suggest that the deception used by Kavars produced false or untrustworthy statements from Smith. The trial court did not err in admitting Smith's statements to Kavars during the interview or in admitting the apology letter written by Smith to E.H.

## 2. SUFFICIENCY OF EVIDENCE

Smith was convicted on one count of first degree sexual assault on a child, second offense, in violation of Neb. Rev. Stat. § 28-319.01(1)(b) and (3) (Cum. Supp. 2012). A person commits first degree sexual assault of a child pursuant to § 28-319.01(1)(b) "[w]hen he or she subjects another person who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older." Section 28-319.01(3) states that any person found guilty of first degree sexual assault of a child and who has previously been convicted under this section (or other sections related to sexual assault of a child) "shall be guilty of a Class IB felony with a mandatory minimum sentence of twenty-five years in prison."

Sexual penetration is defined as

sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. Sexual penetration shall not require emission of semen.

Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2012).

"The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence. It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient." *State v. Archie*, 273 Neb. 612, 642, 733 N.W.2d 513, 536 (2007).

There is no disagreement that E.H. was age 12 and Smith was age 33 at the time of the offense. Rather, Smith argues that the trial court erred in finding he sexually penetrated E.H. and that the evidence lacks the probative value to sustain a guilty verdict. Smith asserts that even if E.H.'s testimony was true, her own testimony that "Smith was not able to place his penis inside the hole of her vagina because she kept moving" and that "she was wiggling around and trying to move and get away the entire time," establishes that there was no sexual penetration. Brief for appellant at 15. Smith argues that "the most [he] could be guilty of is Attempted First Degree Sexual Assault on a Child" and suggests that this lesser-included offense is more appropriate. *Id*. Smith claims that the trial judge's comments at sentencing further support the lesser-included offense when he stated:

I know both sides have indicated to me that penetration, in the normal fashion that we think of it, may not have occurred. Although, under the legal definition of penetration, it did occur. Maybe that's true, sir, but when I look at the entire circumstances of what was going on that moment, that was, to me, every intent you had to succeed at what we would say is normal penetration. It just didn't happen.

Smith argues that these statements by the judge indicate "intent" to penetrate, but that it "just didn't happen," and therefore while the lesser-included offense may have been supported by the evidence, the first degree sexual assault of a child was not. To be persuaded by Smith's argument, we would have to take the last two sentences of the judges' words quoted above out of context from the first two sentences quoted. The trial judge makes it clear that "under the legal definition of penetration, it did occur." As noted previously, sexual penetration only requires "any intrusion, however slight, of any part of the actor's or victim's body . . . into the genital or

anal openings of the victim's body," § 28-318(6), and "entry of the vulva or labia is sufficient," *State v. Archie, supra*. The judge's reference to "normal penetration" not happening is not inconsistent with his holding that "under the legal definition of penetration," penetration "did occur." E.H. confirmed that Smith was touching her "bare vagina with his bare penis" and that his penis felt "hard." Smith did not fully put his penis inside E.H.'s vagina, but placed his penis "[o]n the vagina hole." E.H. confirmed her understanding of the "lips of the vagina" being different "than the actual hole to the vagina," and she said that Smith placed his penis past the lips of her vagina and that it was touching the "hole" of her vagina more than one time. Even a slight intrusion into the genital openings of the victim's body is evidence of penetration.

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013). Taken in the light most favorable to the State, the evidence is sufficient to establish that sexual penetration occurred.

### 3. EXCESSIVE SENTENCE

The statutory range for first degree sexual assault on a child, second offense, a Class IB felony, is a mandatory minimum of 25 years' imprisonment to a maximum of life imprisonment with time served. The trial court sentenced Smith to serve a term of 35 to 45 years' incarceration with credit given for 407 days served. Smith's sentence fell within the statutory range. A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and just result. *Id*. In considering a sentence to be imposed, the sentencing court is not limited in its discretion to any mathematically applied set of factors; the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013).

Smith argues that the sentence is excessive "considering that Smith is nonviolent, is intelligent, and has a potential to benefit society," and has "always financially supported himself and his children." Brief for appellant at 19. Smith further argues that the prior sexual assault conviction for which he received probation was more than 12 years ago and "was not a forcible sexual assault" (it involved an alleged consensual relationship between Smith and a 15-year-old girl) and that "the current offense was also not a forcible sexual assault." *Id*. At sentencing,

Smith's educational and work background was raised for consideration by the court, along with the assertions noted above, and it was also suggested that Smith has a "large extended family and has a tremendous amount of family support." *Id.*

The presentence investigation report reveals a juvenile history (including a revoked probation due to a felony drug possession charge that resulted in Smith's placement at a youth rehabilitation and treatment center) and adult felony arrests and convictions, including the prior sexual assault conviction and a federal incarceration for drug (intent to deliver cocaine) and weapons possession. After Smith served 5 years in a federal penitentiary in Illinois, he was released on federal supervised probation in March 2009. While on federal supervised probation, he committed a sex offender registration violation that resulted in his second prison sentence with the Nebraska Department of Correctional Services from 2010 to 2011. He was also on federal supervised probation when he committed the present offense. Smith has spent a large part of his life either in a county jail, in a state or federal institution, or on supervised probation. He has been arrested 22 times, 9 of them felony arrests. He has had two jail sentences, has had two prison sentences, and has received probation three times and had probation revoked three times. His criminal record demonstrates a long history of antisocial behavior through his own involvement and by association with other individuals involved in antisocial or high-risk activities, including siblings who have criminal records. Additionally, contrary to Smith's assertion in his brief representing that he has financially supported himself and his children, all three of whom have different mothers, the presentence investigation report shows that Smith himself believes he owes substantial arrearages in child support. At the time of Smith's arrest in this matter, he had been working full time as a machine operator for a manufacturing company for 5 months. He was living with his 54-year-old girlfriend of 3 years and would be relying on her for financial support and shelter.

The trial court noted the seriousness of the offense, as well as the fact that it was a second offense. In *State v. Ramirez*, 284 Neb. 697, 823 N.W.2d 193 (2012), the defendant was convicted of sexually assaulting his 16-year-old niece and was sentenced to 25 to 30 years in prison for the sexual assault on a child and 10 to 20 years in prison for incest. The Nebraska Supreme Court reiterated that "'[s]exual assault on a child is a serious and deplorable crime, and the injury that results from this type of assault is well established.'" *Id.* at 702, 823 N.W.2d at 197-98 (quoting *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007)). The sentencing range available to the trial court for Smith's offense was a mandatory minimum of 25 years' imprisonment to a maximum of life imprisonment with time served. Smith was sentenced to a term of 35 to 45 years' incarceration with credit given for 407 days served. Based upon this record, it cannot be said that the district court abused its discretion in sentencing Smith.

## V. CONCLUSION

We conclude (1) there was no error in the admission of Smith's statements, (2) there was sufficient evidence to support the essential elements of the crime beyond a reasonable doubt, and (3) there was no abuse of discretion by the trial court in determining Smith's sentence. Accordingly, we affirm Smith's conviction and sentence.

AFFIRMED.